UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

KIM MCLAUGHLIN, PSY. D.,                          **Docket No.:**

                             *Plaintiff,*        **COMPLAINT**

    -against-                                     **PLAINTIFF DEMANDS**
                                                          **A TRIAL BY JURY**
UNITED ACTIVITIES UNLIMITED, INC.,

                             *Defendant.*
-------------------------------------------------------------------X

       Plaintiff Kim McLaughlin, Psy.D., as and for her Complaint, respectfully alleges, all upon information and belief, as follows:

<u>**JURISDICTION AND VENUE**</u>

       1.    This Court has original jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C. §1331, in that certain of the Plaintiff's claims arise under the laws of the United States, namely Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e-2 et seq., as amended ("Title VII"), and supplemental jurisdiction exists over the remainder of Plaintiff's claims under Chapter 1, Title 8 of the Administrative Code of the City of New York, §§8-107(1)(a) and (7).

       2.    Venue is proper under 28 U.S.C §1391(b) because the events underlying this action occurred within the Eastern District of New York and because Defendant does business within the District.

       3.    Plaintiff filed a charge of unlawful discrimination with the Equal Employment Opportunity Commission on April 21, 2022 and received a Notice of Right to Sue against Defendant on September 27, 2022.

## IDENTITY OF THE PARTIES

3.      At all relevant times mentioned herein, Plaintiff Kim McLaughlin, Psy.D. ("McLaughlin"), was employed by Defendant United Activities Unlimited, Inc. ("UAU") until she was terminated on March 30, 2022 because of her complaints of gender discrimination and retaliation.

4.      UAU is a New York corporation located in the County of Richmond, City and State of New York.

5.      UAU is a non-profit social service organization that offers services including afterschool programs, comprehensive community centers, workforce development programs, employment training, prevention education and counseling, family and social services, fatherhood programs, college preparatory activities, literacy classes, educational enrichment and summer camps.

## BACKGROUND RELEVANT TO ALL CAUSES OF ACTION

6.      McLaughlin began her employment with UAU in 1992.

7.      At all relevant times, McLaughlin was qualified for her position.

8.      McLaughlin was then a third-grade teacher for the New York City Department of Education ("DOE") and was pursuing a Master's Degree in School Psychology.

9.      McLaughlin's then-Principal recommended her for the role of Group Leader with UAU, to lead activities for students at the UAU summer camp, and by the end of the first week of camp, McLaughlin was elevated to the role of an Office of Alcohol and Substance Abuse Services ("OASAS") Counselor at the camp and was responsible for interventions and assisting with the summer camp management.

10.     At that time, UAU was a small entity that had only two year-round funded programs and four full-time employees.

11.     At all relevant times, the Executive Director of UAU was Louis DeLuca ("DeLuca"), who was in that role when McLaughlin commenced her employment with UAU in 1992 and remained in that position and on salary until December 31, 2021, and he passed away on January 2, 2022 at the age of 88.

12.     McLaughlin remained as a DOE teacher and, in 1993, she became a DOE School Psychologist.

13.     Due to her education, McLaughlin became a Supervisor of OASAS counselors and continued to work part-time year-round for the agency in a supervisory capacity.

14.     In 1999, McLaughlin obtained her Doctorate in School and Community Psychology and also gave birth to her first child.

15.     McLaughlin had four children over the next five years and, pursuant to DOE policy, was permitted to remain on maternity leave until her youngest child reached school age, which was in 2009.

16.     During the 10 years that McLaughlin was on maternity leave, she continued to work for UAU part-time, but her training and education allowed her to create and assume additional roles that did not previously exist in the agency.

17.     For example, McLaughlin became the Academic and Clinical Director and she secured additional grants and programs and simultaneously created more robust and effective programs.

18.     McLaughlin worked collaboratively with Liz Licata ("Licata"), the Associate Executive Director, to improve the agency and community programs, and DeLuca, who preferred

to be called a "CEO," was not engaged in the vision or the daily functioning of the agency.

19.     While McLaughlin was technically working part-time for UAU, her work hours and responsibilities depended on what the agency needed, and McLaughlin often worked full-time hours.

20.     In or around 2005, Executive Director DeLuca, who was approximately 72 years old at that time, began openly talking to McLaughlin and staff about her succeeding him as Executive Director when he retired.

21.     Over the many years that followed, DeLuca would consistently talk about McLaughlin taking over as Executive Director and would begin sentences saying "When Kim [McLaughlin ] takes my seat…"

22.     When McLaughlin's maternity leave ended in or around 2009, DeLuca asked her to not return to the DOE, but to instead increase her hours and assume the title of Associate Executive Director of UAU, and McLaughlin agreed.

23.     In or around 2014, Licata began preparing to retire and McLaughlin assumed more responsibilities and increased her work hours.

24.     In 2015, Licata retired and McLaughlin was thereafter responsible for all programmatic, personnel, and operational aspects of UAU, as well as the development of the agency and resources and relationships with stakeholders and funders, though McLaughlin had no responsibility for fiscal decisions, as DeLuca did not want any interference or input into his financial decisions.

25.     McLaughlin became the face of the agency and consistently communicated with funders and stakeholders and was known as "Dr. Kim" throughout Staten Island and with City-wide funders.

4

26.     Under McLaughlin's leadership, UAU grew from a small agency with a $900,000 budget and four full-time employees to an established organization with 65 full-time employees, over 350 part-time employees, and a budget of $13,000,000.

**McLaughlin Was Told She Would Not Be Considered For**
**The Executive Director Role Because She Was Viewed**
**As An "Administrative Assistant" And A "Secretary"**

27.     On or about August 11, 2020, DeLuca stated he would be retiring in December 2021.

28.     Although DeLuca had consistently referred to and guaranteed McLaughlin succeeding him as Executive Director for 15 years, DeLuca told her that the Board would be forming a succession committee.

29.     McLaughlin asked about becoming the Executive Director, at which point DeLuca told her that the Board was interested in a "figurehead" and someone who would be "the face of the agency," to which McLaughlin responded that she *was* the face of the agency.

30.     DeLuca then told McLaughlin that the Board viewed her as an **"administrative assistant,"** which was a clear reference to her gender and UAU's perception that McLaughlin, as a woman, had to step back and be a supporting figure for a man, as she had been with DeLuca.

31.     DeLuca also described McLaughlin as a **"secretary"** when telling her that she would not be genuinely considered for the Executive Director position.

32.     This was highly insulting to McLaughlin, as she had worked diligently and strategically to lead and develop the agency, had earned a Doctorate in Community Psychology, which was perfectly aligned to UAU's mission, had created and implemented programming, all of which had built her reputation as the head of the agency, being a woman should not have precluded her from leading the organization.

33.   McLaughlin also knew that when DeLuca described how the "Board" saw her, he was really describing how he saw her, and his perception controlled the Board, as he had hand-picked the Board members after decades as Executive Director and controlled their views, access to information and decisions.

34.   The Board was male-dominated and McLaughlin witnessed how the female members were marginalized for years, as she had seen female Board members be excluded from receiving information and voice their concerns that their opinions were not being considered,

35.   For example, McLaughlin attended a Board meeting on August 17, 2021, where female Board member Verna Lauria complained that the female members were not being informed of all that is going on and that "it is like there are two Boards."

36.   Additionally, McLaughlin had witnessed DeLuca disparage female Board members while speaking on the phone with male Board members, including Tom Dugan, Michael Coppotelli, Jim Cohen and Ken Mitchell, Joe Solazzo and Anthony Minardo, which included DeLuca saying about the women, only by way of example:

- The women are "stupid;"

- They were "lucky they were allowed on the Board" and should be "grateful;"

- They have "dumb ideas;"

- They contribute "nothing;"

- They are "wannabes;"

- That any idea they have "will be blocked"

- They will "never be able to change the bylaws;"

- They will "never get the President's position"

6

- Their husbands "must thank God when they leave the house to go to the Board meetings;" and

- They are "pains in the ass."

- When McLaughlin told DeLuca in or around July 2020 about PPP funds being mishandled by the male CFO, DeLuca responded, "Not to worry. **Men are better in math.** You handle the program side and we will take care of the fiscal matters."

- When a prominent woman joined the Board and asked very good questions at a Board meeting in early 2021, DeLuca said to McLaughlin, "**I don't know about her. She might turn out to be a bitch.**"

- When a reportedly African American woman joined the Board, DeLuca said that she would be the "Black representation" on the Board, but after meeting her, he told McLaughlin, **"When you look at her, she clearly is not Black enough. She might just side with the women."**

- DeLuca derogatorily referred to a single mother by saying, "She couldn't even get a man to sleep with her," "She had to arrange to meet someone in a hotel to conceive her son," "Who would have her? She is so annoying. He probably ran out of there," "She wanted a child and she couldn't find anyone to sleep with her" and, "She might have had to pay him."

- McLaughlin heard DeLuca repeatedly brag to other male Board members that three of the women on the Board "owe" him for their job and stated that, "without [him], they would still be a receptionist or unemployed."

37. McLaughlin had also heard Dugan degrade the women on the Board, stating that when they speak, "it is like herding cats."

38. McLaughlin had also seen many women be paid less than male counterparts for similar work, even where the women were more qualified and doing more work, which concern was shared with DeLuca and Board members.

7

39.     McLaughlin also heard DeLuca degrade women, which included his telling McLaughlin that when he hired his secretary, "she had no secretarial skills, she just looked better than the other applicants," and he said to a woman, from the podium while giving a speech, "I left the hotel key on the dresser next to you," implying that he had had sex with the woman.

40.     Nevertheless, given McLaughlin's decades of leadership, education, experience, reputation, outcomes and contribution to UAU, McLaughlin knew she was the best candidate to assume the Executive Director position.

41.     DeLuca acknowledged to McLaughlin that the Board knew she ran and developed the agency, and that the next Executive Director would "need" McLaughlin to be successful.

42.     Despite McLaughlin's qualifications, what UAU really wanted was a man to serve as Executive Director and McLaughlin, as a woman, was viewed only as a "secretary," so that her gender prevented her from being the "figurehead" the organization wanted, as confirmed by the following examples:

- McLaughlin told DeLuca in October 2020 that she still intended to apply for the Executive Director role, but DeLuca tried to dissuade her, saying, "I can't change the Board's mind. They are looking for a figurehead. **They see you as a secretary."**

- DeLuca again tried to deter McLaughlin from applying on or about November 23, 2020, when DeLuca brought McLaughlin into his office and told her that he spoke with various Board members and they "guaranteed" her employment, saying, "They all know you deserve it" and "They all know what you have done for the agency." When McLaughlin responded to DeLuca that she was still going to apply, DeLuca repeated that the Board wanted a "figurehead," which she knew really meant they want a man.

- DeLuca assumed that the next Executive Director would be a man, telling McLaughlin that she had "no worries" because she would "continue to be the number two for the next guy,"

and also spoke about the three men that started the agency and that "a man of equal stature will be the next CEO."

- On or about May 12, 2021, DeLuca told McLaughlin that the Board would do what Thomas Dugan ("Dugan"), the President of UAU's Board, directed, since Dugan knew "the men" on the Board would vote his way, and DeLuca then made a list of the men on the Board that would follow Dugan, outlining how the Board was controlled by the male members.

- On or about May 21, 2021, DeLuca took McLaughlin into his office and said that the Board was planning who to ask to apply for the Executive Director role and repeated that the Board saw her as a "secretary" and wanted a "figurehead." McLaughlin asked why the Board would see her, a Doctor of Psychology that built the agency as a "secretary," and DeLuca responded, "I cannot help it."

- McLaughlin spoke with Board President Dugan directly on or about May 21, 2021, at which time he told her himself that the Board was looking for a "figurehead," and McLaughlin responded that this was a misguided notion, since the funds the agency relies upon are acquired by merit and grant writing, which she had done for the organization, and that the agency was excelling because of merit and outcomes, not a figurehead.

- McLaughlin emailed Dugan four days later stating that she hoped to have the opportunity to interview for the Executive Director position, but he did not respond to her email.

- McLaughlin also told Dugan via email that DeLuca had started referring to her as a secretary.

- McLaughlin spoke with Dugan on the phone several more times between May and September 2021 and he repeatedly referenced the agency needing a "figurehead." Each time, McLaughlin protested and shared insight regarding the agency and its needs, yet he could not elaborate on any rationale behind the comment.

- In August 2021, McLaughlin spoke with Board Member Kenny Mitchell ("Mitchell") about DeLuca and Dugan

9

saying that the Board was looking for a "figurehead," and Mitchell then made an analogy between a college president who attended meetings and a college provost who "actually does all the work behind the scenes," and that, **"You're the provost,"** which was just another way of dismissing McLaughlin as a "secretary" whose role is to support a man.

43.    McLaughlin became increasingly concerned with some of the financial and organizational decisions made by DeLuca, as well as the misinformation he was giving the Board.

44.    For many years, McLaughlin had seen DeLuca make decisions that compromised UAU, but benefited DeLuca and his friends personally, and McLaughlin spoke about these issues with individual Board members for a number of years prior, but nothing was ever done, and McLaughlin began sharing those concerns with the full Board.

45.    On August 24, 2021, DeLuca brought McLaughlin into his office and, in an angry manner, told McLaughlin that she was "a secretary" and that she was not to communicate with Board members regardless if they approach her.

46.    McLaughlin emailed Nicole Puglia ("Puglia"), UAU's Director of Human Resources, and complained about DeLuca's conduct, and Puglia responded that she noted this and it was "[v]ery sad and upsetting."

**McLaughlin's Interview For The Executive Director**
**Position Takes Place After The Board Determines Finalists**

47.    Despite DeLuca's efforts to prevent her from applying, McLaughlin submitted her candidacy for Executive Director and her interview with the committee was scheduled for September 16, 2021.

48.    McLaughlin knew that there were only three candidates, herself and two men, and that the two men had not previously been involved with UAU and lacked any relevant experience or education.

10

49.     On or around September 9, 2021, days before her interview, Dugan asked McLaughlin, on the phone, to set up technology for the upcoming September 21 Board meeting because "the two finalists for the Executive Director position are going to be interviewed by the full Board," which meant that there were two "finalists" – both men – before McLaughlin was even interviewed.

50.     McLaughlin reminded Dugan that her interview for the ED position was not until next week and that she hoped that her candidacy was still in consideration.

51.     On September 15, 2021, McLaughlin emailed Puglia and told her about how despite the fact that the Board continued to rely on McLaughlin to run the organization, she was not being genuinely considered for the Executive Director position and that she was being viewed as a **"secretary"** and **"the college provost, the person behind the scenes doing the work."**

52.     McLaughlin's interview on September 16, 2021 confirmed that she was not genuinely considered for the Executive Director role, as McLaughlin was asked if pedagogy experience was necessary, and when McLaughlin responded that it was not absolutely necessary, another Board member interrupted her and said to the rest of the interview committee, "See, I told you they don't need teaching experience."

53.     The other two candidates were male lawyers with no teaching or relevant experience or education, so the Board was really using McLaughlin to justify considering these two lesser-qualified men.

54.     Other questions during McLaughlin's interview were also not related to her potential and ability to assume the ED position, and she was instead asked some questions regarding DeLuca's indiscretions, the new CFO and the errors made by the prior CFO.

55.     The CFO told McLaughlin that at the October 2021 board meeting, a female board member complained that there was prejudice against women and females are left out of decisions and discussions, and the Board minutes reflected the woman's concerns.

**McLaughlin Was Placed On Administrative
Leave After Complaining To The Board**

56.     On October 26, 2021, McLaughlin attended a Board meeting, where one of the issues discussed was how the Department of Youth and Community Development provided additional funds in the budget to provide additional compensation to staff that had worked more hours the previous summer with significantly more participants during the global pandemic.

57.     The Board, however, did not want to give that money to the staff, but wanted to use it to provide additional compensation to DeLuca or to the incoming Executive Director.

58.     McLaughlin explained that the funds could not be used for that purpose but must be used for programs, and McLaughlin had several discussions with Dugan and another Board member over the next several days about this issue, and she was told the staff differentials were to be put on hold.

59.     On Friday, October 29, 2021, McLaughlin sent an email to the Board protesting this decision, including "gender inequities that occurred" that have negatively impacted the agency, staff and general morale.

60.     McLaughlin emailed the Board again the following day, October 30, 2020, in response to a question from a Board member about the promised raises, in which McLaughlin discussed how one female employee, "a Latino woman," deserved a raise because she was doing more work than her male predecessor, but was being paid $86,000 less than he was.

61.     McLaughlin's email suggested, "for equity and liability," that this female employee's salary become comparable to the value the position brought.

62.     That night, Saturday, October 30, 2021, Board President Dugan sent McLaughlin an email requesting that she "cease to do any further emails until such time as the Board can meet to review them as a group," and cc'd the entire Board.

63.     McLaughlin responded that same night on October 30, 2021, explaining how alarmed she was by Dugan's email, though she acknowledged that she would follow his directive and not communicate with any Board members.

64.     On Tuesday, November 2, 2021, McLaughlin emailed Puglia and again reported that DeLuca had again described her as a "secretary," which continued to be upsetting since McLaughlin was responsible for all of the agency's programmatic operations, its improved community image, and its significant increase in revenue.

65.     McLaughlin also noted to Puglia how DeLuca had falsely told her that the female members of the Board disliked her, which McLaughlin knew was not true from speaking with two female Board members and, in fact, they verbalized their own frustration about how they had been dismissed and silenced by the overwhelmingly male Board.

66.     McLaughlin also complained to Puglia about how her interview had been a farce and was intended to help DeLuca and the male Board members obtain more information about "what they needed to know to get their male candidates through the process," and that, "This was yet another harsh piece of evidence that the woman that increased the agency's revenue from $900,000 to $13 million, that oversaw most of the operations of the agency, had a relevant doctorate degree and twenty-five years of experience was obviously being denied any real consideration for the position."

67.     Days later, on November 5, 2021, McLaughlin was in the office when an attorney for UAU named John Wm. Zaccone gave her a letter on his letterhead stating that the Board had decided to hire an outside investigator to look into her emails to the Board and that McLaughlin was being placed on a paid administrative leave.

68.     McLaughlin was further directed not to appear at UAU or have any contact with anyone at the organization, which ostensibly was "[t]o provide for a full, open and unfettered investigation."

69.     McLaughlin was horrified that she was the one being removed from UAU, since she had done nothing wrong and had merely pointed out the gender discrimination and advocated for the fair compensation of staff.

70.     Female Board Member Verna Lauria ("Lauria") was present and McLaughlin said to her, "You know they treat the women differently. You said it yourself," and Lauria nodded her head and said, "I know."

71.     What was most humiliating was that on the same day, November 5, 2021, UAU sent an email to the entire staff stating that McLaughlin had been placed on administrative leave pending an investigation and directed anyone who saw her at a UAU facility or received a call or message to inform the Board "as soon as possible," as if McLaughlin had done something wrong.

72.     Being removed from UAU in such a fashion was devastating to McLaughlin and irreparably damaged the reputation she had spent three decades building on Staten Island with City funders and stakeholders.

73.     McLaughlin retained counsel who sent letters to Dugan on November 16, 2021 and on November 23, 2021, though UAU would never respond.

74.     On or about November 18, 2021, UAU announced that Steve Matteo, a man with no relevant experience or education in social services, would take over as Executive Director.

75.     DeLuca passed away on January 2, 2022 at the age of 88.

**McLaughlin Was Terminated In Retaliation For Her Complaints**

76.     On or about November 19, 2021, McLaughlin emailed Dugan and complained about the retaliatory decision to place McLaughlin on administrative leave because of her complaints of gender discrimination.

77.     McLaughlin did not receive a response.

78.     On November 30, 2021, McLaughlin received a letter from a law firm representing that it was investigating "matters that were communicated" to UAU by her.

79.     While McLaughlin's attorney was thereafter in communication with that law firm, McLaughlin continued to hear nothing from UAU.

80.     On January 5, 2022, McLaughlin met with an attorney for UAU for over two hours and answered questions about what happened during her employment at UAU, including the gender discrimination she faced.

81.     On January 14, 2022, McLaughlin received a letter from Dugan informing her that her administrative leave would thereafter be unpaid.

82.     Having her salary taken away from her was devastating, and not knowing when or if it would ever be restored was incredibly frightening and caused tremendous distress to McLaughlin.

83.     McLaughlin emailed the Board on January 19, 2022, to protest the retaliatory decision to place her on an unpaid administrative leave and asking to be permitted to resume her role as soon as possible.

84.     McLaughlin did not receive a response.

85.     McLaughlin emailed UAU again on March 3, 2022 to ask about the status of her employment, since she did not even know if she should apply for unemployment.

86.     On March 30, 2020, McLaughlin received a letter from Dugan terminating her employment, which stated:

> After review of the confidential report and its findings, the Board of Directors of United Activities Unlimited Inc. had [sic] determined to terminate your position as Associate Executive Director, for cause, effective immediately.

87.     McLaughlin was completely stunned by her termination, as UAU had told McLaughlin that she was not under investigation, and that only her allegations were being investigated, so that being terminated "for cause" – when McLaughlin had never even been accused of doing anything wrong – was shocking.

88.     The real reason that McLaughlin was fired was to punish her for her complaints.

89.     As a result of UAU's discriminatory conduct, McLaughlin has suffered the adverse effects of discrimination, which includes damages to the quality of her life, her self-esteem, self-respect and financial and emotional well-being because she was subjected to the humiliating and demeaning type of conduct described herein, all of which will continue and remain a source of humiliation, distress and financial loss to McLaughlin into the future.

90.     Here, UAU's conduct towards McLaughlin shows that it acted with willful or wanton negligence, malice, recklessness, or a conscious disregard of McLaughlin's rights, or that its unlawful actions against McLaughlin were so reckless as to amount to a disregard of McLaughlin's rights, so that in addition to all the damages inflicted upon McLaughlin and in addition to all the measure of relief to which he may properly be entitled herein, UAU should also

be required to pay punitive damages as punishment for its discriminatory conduct in order to deter it and others similarly situated from engaging in such conduct in the future.

**AS FOR A FIRST CAUSE OF ACTION ON BEHALF
OF MCLAUGHLIN AGAINST UAU FOR SEX
DISCRIMINATION IN VIOLATION OF TITLE VII
OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §2000E-2**

91.     McLaughlin repeats, realleges and incorporates in full paragraphs 1 through 90 of this Complaint as though fully set forth herein.

92.     At the time that McLaughlin was subjected to the discriminatory conduct described herein, she was in a protected class under the New York City Human Rights Law because of her sex.

93.     Throughout the time of her employment with UAU, McLaughlin was fully qualified for her position and was in a position to continue working in that capacity.

94.     UAU discriminated against McLaughlin in the terms and conditions of her employment, which culminated in McLaughlin being placed on administrative leave on November 5, 2021, being removed from UAU's payroll on January 14, 2022, and her termination on March 30, 2020.

95.     The circumstances surrounding UAU's actions towards McLaughlin, including repeatedly telling her that she would not genuinely be considered for the Executive Director role because she was viewed as a "secretary," give rise to a very real inference that the actual basis for UAU's conduct against McLaughlin was motivated by McLaughlin's gender.

96.     The aforementioned acts of UAU constitute unlawful discrimination on the basis of sex against McLaughlin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2 et seq. ("Title VII"), which provides, inter alia, that:

> It shall be unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

97.     As a proximate result of UAU's conduct, McLaughlin has been adversely affected in her employment and in her normal life's pursuits, and McLaughlin believes that the injuries she incurred has and will continue to have a devastating effect upon her professional career, as well as the quality of her life.

98.     As a direct and proximate result of UAUs violation of Title VII, UAU is liable to McLaughlin for damages, including punitive damages, as well as reasonable attorney's fees, pre-judgment interest and costs.

99.     Here, the acts of UAU were so egregious and were done with such bad-faith and/or reckless indifference for UAU's protected rights under Title VII, that, in addition to all the damages inflicted upon McLaughlin and in addition to all the measures of relief to which McLaughlin may properly be entitled herein, UAU should also be required to pay punitive damages as punishment for its discriminatory conduct, in order to deter UAU and others similarly situated from engaging in such conduct in the future.

100.    McLaughlin, therefore, seeks compensatory damages on this First Cause of Action, including, among other things, for loss of earnings and loss of earning capacity and for the emotional harm inflicted upon her, in an award to be determined at a trial of this matter, as well as punitive damages, reasonable attorney's fees, the costs of this action and pre-judgment interest, in this Cause of Action.

**AS FOR A SECOND CAUSE OF ACTION ON BEHALF
OF MCLAUGHLIN AGAINST UAU FOR GENDER
DISCRIMINATION IN VIOLATION OF §8-107(1)(a)
OF THE NEW YORK CITY HUMAN RIGHTS LAW**

101.    McLaughlin repeats, re-alleges and incorporates in full paragraphs 1 through 100 of this Complaint as though fully set forth at length herein.

102.    At the time that McLaughlin was subjected to the discriminatory conduct described herein, she was in a protected class under the New York City Human Rights Law because of her gender.

103.    Throughout the time of her employment with UAU, McLaughlin was fully qualified for her position and was in a position to continue working in that capacity.

104.    UAU treated McLaughlin less well because of her gender, including her ultimate termination, as confirmed by the fact that UAU did not genuinely consider her for the Executive Director role because she was viewed as a "secretary," all of which give rise to a very real inference that the actual basis for UAU's conduct against McLaughlin was her gender.

105.    The aforementioned acts of UAU constitute unlawful pregnancy discrimination against McLaughlin in violation of Chapter I, Title 8 of the Administrative Code of the City of New York, §8-107(1)(a) (referred to herein as "The New York City Human Rights Law"), which provides, *inter alia* that:

> It shall be unlawful discriminatory practice . . .[f]or an employer or an employee or agent thereof, because of the gender . . . of any person . . . to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

106.    As a result of 's violations of the New York City Human Rights Law §8-107(1)(a), UAU is liable to McLaughlin pursuant §8-502(a) of said statute for "damages, including punitive

damages," and pursuant to §8-502(f) of the statute for "costs and reasonable attorney's fees," as provided for under the law.

107. As a result of UAU's discriminatory and retaliatory conduct, McLaughlin has suffered actual and prospective financial loss, which McLaughlin alleges to be in the amount of Two Million Dollars ($2,000,000).

108. Here, UAU's conduct toward McLaughlin shows that it acted with willful or wanton negligence, or recklessness, or a conscious disregard of McLaughlin's rights under the New York City Human Rights Law, or that its unlawful actions against McLaughlin were so reckless as to amount to a disregard of McLaughlin's rights, so that in addition to the actual and prospective financial loss suffered by McLaughlin, UAU should also be required to pay punitive damages as punishment for its reprehensible conduct in the further amount of Three Million Dollars ($3,000,000) in order to deter UAU and others similarly situated from such conduct in the future.

109. McLaughlin, therefore, seeks judgment against UAU in the amount of Five Million Dollars ($5,000,000), plus costs, pre-judgment interest and reasonable attorney's fees on this Second Cause of Action.

**AS FOR A THIRD CAUSE OF ACTION ON
BEHALF OF MCLAUGHLIN AGAINST UAU
FOR RETALIATION IN VIOLATION OF TITLE VII
OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §2000E-3**

110. McLaughlin repeats, re-alleges and incorporates in full paragraphs 1 through 109 of this Complaint as though fully set forth at length herein.

111. Each time that McLaughlin protested discrimination in her workplace, she was engaged in a protected activity under Title VII of which UAU was aware.

112.    As a proximate result of McLaughlin engaging in protected activities under the New York City Human Rights Law, McLaughlin suffered adverse employment action, culminating in her termination on March 30, 2022.

113.    The circumstances in this case, including the close temporal proximity between McLaughlin's protected activities on October 29, 2021 through November 2, 2021 and her being placed on administrative leave on November 5, 2021, demonstrates that UAU's actions towards McLaughlin were motivated, at least in part, by her complaints of discrimination.

114.    UAU's unlawful conduct had a devastating impact on McLaughlin employment, her emotional well-being, the quality of her life and her life's normal pursuits, which injuries McLaughlin believes will continue to cause her significant damage.

115.    UAU's aforementioned acts constitute unlawful discriminatory retaliation against McLaughlin in violation of Title VII, 42 U.S.C. §2000e-3(a), which provides, *inter alia*, that:

> It shall be unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made unlawful employment practice by the subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

116.    As a direct and proximate result of UAU's violation of Title VII, UAU is liable to McLaughlin for damages, including punitive damages, as well as reasonable attorney's fees, pre-judgment interest and costs.

117.    Here, the acts of UAU were so egregious and were done with such bad-faith and/or reckless indifference in the face of a perceived risk that its actions would violate McLaughlin's protected rights under the law that, in addition to all the damages inflicted upon McLaughlin and in addition to all the measures of relief to which McLaughlin may properly be entitled herein,

UAU should also be required to pay punitive damages in an award to be determined at a trial of this matter as punishment for its discriminatory conduct, in order to deter UAU and others similarly situated from engaging in such conduct in the future.

118.    As a direct and proximate result of UAU conduct complained of herein, McLaughlin has suffered damages, injuries and losses, both actual and prospective, which include financial loss, damage to her career and emotional pain and suffering, so that McLaughlin seeks in this Third Cause of Action compensatory damages in an amount to be determined at a trial of this matter, as well as reasonable attorney's fees, the costs of this action and pre-judgment interest.

119.    McLaughlin, therefore, seeks compensatory damages in this Third Cause of Action, including among other things, for the financial and emotional harm inflicted upon her, in an award to be determined at a trial of this matter, as well as punitive damages, reasonable attorney's fees, the costs of this action and pre-judgment interest, in this cause of action.

### AS FOR A FOURTH CAUSE OF ACTION ON BEHALF OF MCLAUGHLIN AGAINST UAU FOR RETALIATION IN VIOLATION OF §8-107(7) OF THE NEW YORK CITY HUMAN RIGHTS LAW

120.    McLaughlin repeats, re-alleges and incorporates in full paragraphs 1 through 119 of this Complaint as though fully set forth at length herein.

121.    Each time that McLaughlin protested discrimination in her workplace, she was engaged in a protected activity under the New York City Human Rights Law of which UAU was aware.

122.    As a proximate result of McLaughlin engaging in protected activities under the New York City Human Rights Law, McLaughlin suffered adverse employment action, culminating in her termination on March 30, 2022.

123.    The circumstances in this case, including the close temporal proximity between McLaughlin's protected activities on October 29, 2021 through November 2, 2021 and her being placed on administrative leave on November 5, 2021, demonstrates that UAU's actions towards McLaughlin were motivated, at least in part, by her complaints of discrimination.

124.    The aforementioned acts of UAU constitute unlawful retaliation against McLaughlin in violation of §8-107(7) of the New York City Human Rights Law, which provides, inter alia, that:

> It shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter . . .

125.    As a result of UAU's violations of the New York City Human Rights Law §8-107(7), UAU is liable to McLaughlin pursuant §8-502(a) of said statute for "damages, including punitive damages," and pursuant to §8-502(f) of the statute for "costs and reasonable attorney's fees," as provided for under the law.

126.    McLaughlin has been caused to suffer injuries resulting in financial loss, emotional anguish and suffering, and has been humiliated, demeaned and otherwise degraded because of UAU's outrageous conduct in violation of McLaughlin's human rights, all of which has impacted her emotional and physical well-being and the quality of her life.

127.    As a direct and proximate result of UAU's retaliatory conduct complained of herein, McLaughlin has suffered damages, injuries and losses, both actual and prospective, which include the loss of her job and the emotional pain and suffering she has been caused to suffer and continues to suffer, which has impacted her physical well-being, all of which McLaughlin alleges to be in the amount of Two Million Dollars ($2,000,000).

128.   Here, UAU's conduct towards McLaughlin shows that it acted with willful or wanton negligence, or recklessness, or a conscious disregard of McLaughlin's rights under the New York City Human Rights Law, or that its unlawful actions against McLaughlin were so reckless as to amount to a disregard of McLaughlin's rights, so that in addition to all the damages inflicted upon McLaughlin and in addition to all the measures of relief to which McLaughlin may properly be entitled herein, UAU should additionally be required to pay punitive damages as punishment for its discriminatory conduct in the further amount of Three Million Dollars ($3,000,000), in order to deter it and others similarly situated from engaging in such conduct in the future.

129.   McLaughlin, therefore, seeks judgment against UAU on this Fourth Cause of Action, including, among other things, for compensatory damages in the sum of Two Million Dollars ($2,000,000), and the additional further sum of Three Million Dollars ($3,000,000) in punitive damages, together with costs, pre-judgment interest and reasonable attorney's fees on this Cause of Action, making a total claim of Five Million Dollars ($5,000,000).

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

**WHEREFORE**, Plaintiff demands judgment against Defendants on the First Cause of Action in an award of compensatory and punitive damages to be determined at a trial of this matter; on the Second Cause of Action in the sum of Two Million Dollars ($2,000,000) in compensatory damages and Three Million Dollars ($3,000,000) in punitive damages, for a total of Five Million Dollars ($5,000,000); on the Third Cause of Action in an award of compensatory and punitive damages to be determined at a trial of this matter; on the Fourth Cause of Action in the sum of Two Million Dollars ($2,000,000) in compensatory damages and Three Million Dollars

($3,000,000) in punitive damages, for a total of Five Million Dollars ($5,000,000); plus, on each

Cause of Action, pre-judgment interest, the costs of this action and reasonable attorney's fees as

is permitted under the law; and for such other and further relief as this Court deem just and proper.

**SCHWARTZ PERRY & HELLER LLP**
*Attorneys for Plaintiff*

By: _____

BRIAN HELLER
DAVIDA S. PERRY
3 Park Avenue, Suite 2700
New York, NY 10016
(212) 889-6565